IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No. 05-cv-01562-LTB-MJW

DOUG PACE,

Plaintiff,

v.

UNITED SERVICES AUTOMOBILE ASSOCIATION, a/k/a USAA,

Defendant.

---

ORDER

---

The defendant, United Services Automobile Association, a/k/a USAA moves for summary judgment in its favor on the claims of the plaintiff Doug Pace. Mr. Pace asserts claims for race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and applicable provisions of state law, and age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and Colo. Rev. Stat. § 24-34-402. The motion is adequately briefed and oral argument would not materially aid its resolution. For the reasons stated below, I GRANT the motion in part and DENY it in part.

**I. Facts**

Material disputes of fact are noted among the undisputed facts recited hereafter. Mr. Pace, born in 1951, began his employment with USAA's insurance division on November 23, 1987. Throughout his tenure, he consistently garnered positive performance evaluations and on

January 28, 2001 was promoted to Director, Regional Physical Damage in USAA's Mountain States Regional Office ("MSRO"). In that capacity, Mr. Pace supervised two Physical Damage Operations Managers, who supervised between five and six Physical Damage Managers, who in turn each supervised a team of adjusters.

Mr. Pace answered directly to Greg Broekelman, Assistant Vice President for Claims. Mr. Broekelman consistently evaluated Mr. Pace's performance with ratings of "meets expectations" and "exceeds expectations," laudatory designations on USAA's evaluation scale. (USAA rated employees: "below expectations," "partially meets expectations," "meets expectations," "exceeds expectations," and "far exceeds expectations.") Mr. Broekelman considered Mr. Pace a "good leader."

In 2000, USAA acquired a new CEO. Thereafter, the company embarked upon a reorganization with the primary objective of reducing expenditures on employees. USAA established as an express goal an increase in turnover from just under six percent to between ten and twelve percent. Mr. Broekelman observed that "management personnel with longevity with the company were most vulnerable as targets of the cut backs." Other employees speculated that USAA was targeting older employees.

By affidavit, James Pearce, a former regional Physical Damage Director for USAA, states that in 2002 he contemplated retirement but his supervisor, Jim Naylor, encouraged him to stay. In November of 2003, USAA dismissed Mr. Naylor, who was then in his fifties. Mr. Pearce's new supervisor, who had not supervised him in 2003, gave him a negative performance evaluation for that year, his first unfavorable review in more than twenty years with the company. The evaluation contained negative comments about Mr. Pearce that had not previously been disclosed

to him, in violation of company policy. Mr. Pearce, anticipating an abrupt termination, instead retired. He was 59 years of age.

Terry Fisher, a former Property Field Manager with USAA, avers that he resigned in March, 2006 at the age of 53, a few months shy of eligibility for early retirement, after enduring captious behavior by a supervisor. In deposition, Mr. Pace identified other former USAA employees known to him who after attaining fifty years of age were “run out” of the company: Jeff Farthing, Bill Gray, Jim Eliassen, Chris Oschner, Sandra Hocking, Georgianne Pavlika, Colonel Quinlan, Ron McConaughy, Ron Hubbard.

In November, 2002, Mr. Broekelman, then age 57, was dismissed without warning. He had never received a negative performance review or any discipline. Yvette Segura, an Hispanic female age 41, replaced Mr. Broekelman on January 2, 2003 at the MSRO. On March 3, 2003, Ms. Segura and other superiors addressed Mr. Pace and other mid-level management in a meeting unlike any Mr. Pace had experienced. The atmosphere was combative; Mr. Pace compared the event to a fraternity hazing. Executives demanded that Mr. Pace provide statistics concerning physical damages. Mr. Pace, who had never before encountered comparable questions, advised his superiors that he did not know the numbers by memory. He estimated and promised to obtain specifics upon returning to his office. Mr. Pace was also criticized for failing to reconcile USAA’s salvage records with the accounts of junk yards within his region. This surprised Mr. Pace because, he claims, USAA had removed from him responsibility for these reconciliation audits in November, 2002. (USAA disputes this assertion.) Before that date Mr. Pace had awaited from Ms. Segura and other executives a protocol for performance of the task, which had never arrived. (USAA disputes this assertion, as well.) However, he promised to produce the

reconciliations and did so within three weeks.

On April 8, 2003, the reconciliations in hand, Ms. Segura nevertheless disciplined Mr. Pace, issuing a "Step 2" written warning. The document criticized Mr. Pace for failing to conduct salvage reconciliation audits but also included unspecified criticisms for Mr. Pace's putative failures to "[p]rovide clear guidance" and "direction and leadership" to his staff and to make a "[c]oncerted effort to meet commitments set forth in any Internal Audit findings and observations... ." It warned, "Failure to meet and sustain these expectations, or any further performance issues, violation of USAA's policies, Core Values, or standards of performance, attendance, and conduct will result in further corrective action, up to an including termination of employment." Mr. Pace's signature, which he supplied, confirmed his "commitment to immediately correct and maintain an acceptable level of performance and to follow USAA's policies... ."

In October, 2003, the USAA human resources department determined to discipline a subordinate of Mr. Pace, Angela Dzialo, among others, for forwarding an inappropriate email while at work. When Mr. Pace confronted Ms. Dzialo with a written warning, she protested that she had not read the email before forwarding it, and had thus transgressed unintentionally. Mr. Pace agreed that the punishment was too harsh in her case, but explained that company rules must be applied consistently and that the applicable policy called for a written warning in response to this violation. Ms. Dzialo took this to mean that Mr. Pace was required to administer the punishment that human resources mandated.

Mr. Pace encouraged Ms. Dzialo to commit to writing her account of the event. On October 16, 2003, Ms. Dzialo emailed Mr. Pace, writing,

> In reference to our conversation yesterday, I wanted to put something together to explain my side of the story. I also felt as (sic) it was important to let you know my feelings on this situation, and have something formal to attach to the HR paperwork. I again apologize for my poor judgment, and hope that you don't think any less of me because of the situation. Thank you for your support.

A document attached to the email recited Ms. Dzialo's recollection of events and asserted, "I honestly did not realize that the e-mail contained information which was in violation of company policy. The first time that I knew the e-mail was considered to be inappropriate, was when I was approached by my manager, at the direction of Human Resources." Mr. Pace considered the last phrase undesirable; he anticipated that human resources would object to any failure by him to take responsibility for the discipline. He sought and obtained Ms. Dzialo's permission to delete the phrase before forwarding the document. (Ms. Dzialo disputes that assertion.) The version of the document that Mr. Pace forwarded to Ms. Segura is identical to the one Ms. Dzialo wrote except that it omits "at the direction of Human Resources."

On October 28, 2003, Ms. Segura met with Ms. Dzialo, who again complained of her treatment. Ms. Dzialo told Ms. Segura that Mr. Pace had opined that, though the punishment was too harsh, he was bound by human resources' directive. Ms. Segura reiterated what Mr. Pace had told Ms. Dzialo: the corrective action was consistent with the violation. Ms. Dzialo also told Ms. Segura that Mr. Pace had amended her rebuttal statement without consent by deleting "at the direction of Human Resources." Mr. Pace contradicted this account in a subsequent meeting with Ms. Segura.

Mr. Pace's subordinate in Seattle, Washington was Jay De Boer, a Physical Damage Operations Manager. One of Mr. De Boer's subordinates, Physical Damage Manager Allan Stein, throughout 2001 and 2002 attained a "partially meets" designation on his performance evaluation.

That rating signifies that the designee has performed at a satisfactory level in some but not all areas.

Mr. Stein's performance did not improve in 2003. On August 29, 2003, Mr. Pace wrote to Mr. De Boer, with a copy to Ms. Segura, recommending that Mr. De Boer conduct a mid-year review with Mr. Stein. Throughout September, 2003, Messrs. Pace and De Boer and Ms. Segura communicated about Mr. Stein over email. On September 3, 2003, Mr. De Boer advised that Mr. Stein was "a bit more on-track," but had missed two recent deadlines. Messrs. Pace and De Boer agreed that this behavior was problematic.

On September 17, after meeting with Mr. Stein on September 8, Mr. De Boer wrote Mr. Pace and Ms. Segura to report that Mr. Stein had not satisfactorily explained the missed deadlines. Ms. Segura responded that she was "very concerned about Allen's progress." She was "not sure if this warrants a Step 3" warning, but suggested that someone motivate Mr. Stein by discussing with him the prospect of termination.

On November 6, 2003, Ms. Segura fired Mr. Pace, stating that she had lost confidence in his leadership ability. She cited as bases his management of Ms. Dzialo and Mr. Stein. She now asserts by affidavit that Mr. Pace should have disciplined Mr. Stein in February, 2003 and faults Mr. Pace for not issuing the step 3 warning about which she expressed doubt in September, 2003. Her written notification of separation stated,

> Reason for: Loss of confidence / lack of judgment based upon demonstration of poor leadership and management practices. Active Step 2 Written Warning – Performance addressed leadership concerns. Subsequent events revealed poor performance management and follow-up on a field management situation. In addition, poor judgment and lack of leadership displayed when handling a direct report corrective action situation.

USAA replaced Mr. Pace with a subordinate, Scott Schneewind. Mr. Pace had expressed

confidence in Mr. Schneewind, and had invariably appraised his work favorably. However, Mr. Schneewind had borne direct responsibility for the salvage reconciliations for which Ms. Segura issued the written warning to Mr. Pace. Though Mr. Schneewind's age at the time of his promotion is the subject of dispute, he was either 39 or 41.

**II. Discussion**

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). I shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**A. Non age-related claims**

USAA argues that Mr. Pace's sex discrimination, race discrimination, and retaliation claims are barred for lack of exhaustion of remedies. As USAA observes, Mr. Pace indicated only age discrimination as the basis of his charge with the Equal Employment Opportunity Commission ("EEOC"). Furthermore, in the narratives contained in both his original charge and his amended charge, Mr. Pace discussed only age discrimination. *Robinson v. Board of Regents of University of Colorado*, 390 F. Supp. 2d 1011, 1019 (D. Colo. 2005).

Mr. Pace points to a list of colleagues he included in his EEOC charge, which, he asserts, put USAA on notice of his claims. The list includes men and women, all but one of whom, like Mr. Pace, are Caucasian, who received the same or more favorable treatment. Nothing in this list

can be taken as an allegation of race or sex discrimination or retaliation.

**B. ADEA claim**

The ADEA provides, *inter alia*, "It shall be unlawful for an employer... to discharge any individual... because of such individual's age... ." 29 U.S.C. § 623(a)(1). The ADEA protects employees who are 40 or older. 29 U.S.C. § 631(a). To prevail on his ADEA claim Mr. Pace must establish that his age, 52, was a determining factor in USAA's decision to fire him. *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996). He need not prove that age was the sole reason for USAA's acts, but must show that age made the difference in USAA's decision. *Id*. Absent direct or circumstantial evidence that age was a determining factor, Mr. Pace is entitled to make his case under the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

For the purposes of this motion, USAA concedes that Mr. Pace has established a *prima facie* case. It offers as a legitimate, non-discriminatory reason for Mr. Pace's termination Ms. Segura's loss of confidence in his leadership, prompted by the failure to reconcile salvage records and Mr. Pace's mismanagement of Ms. Dzialo and Mr. Stein. It falls on Mr. Pace, then, to present specific facts significantly probative to support an inference that USAA's proffered justification is a pretext for discrimination. *Pippin v. Burlington Resources Oil And Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006). He may demonstrate pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in USAA's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that USAA did not act for the asserted non-discriminatory reasons. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Before Ms. Segura assumed supervision of Mr. Pace, Mr. Pace enjoyed invariably favorable performance evaluations. Mr. Broekelman expressly praised Mr. Pace's leadership ability. The sudden deterioration in evaluations of Mr. Pace's leadership in the ten months after Ms. Segura replaced Mr. Broekelman raises an issue of fact whether Ms. Segura's confidence in Mr. Pace's leadership was truly the reason for his discharge. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218-1219 (10th Cir. 2002). Indeed, nothing in the voluminous record of Mr. Pace's long tenure with USAA suggests that Ms. Segura's assessment followed any precedent.

Furthermore, the subjectivity inherent in Ms. Segura's critique gives cause for skepticism. *Garrett*, 305 F.3d at 1218. The ambiguity of the April 8, 2003 written warning forfends a clear understanding of its purposes. That Mr. Pace had already corrected the one specific infraction identified does not, by itself, suggest pretext. However, Mr. Pace was not disciplined for the lack of reconciliations before November, 2002, when he undisputedly bore responsibility for them. Indeed, his 2001 and 2002 performance evaluations do not mention the salvage reconciliations. And USAA does not dispute that responsibility for reconciliation had passed from Mr. Pace several months before Ms. Segura issued the written warning. Nor does USAA explain the decision to replace Mr. Pace with Mr. Schneewind, who was directly responsible for the reconciliations. Also, USAA does not here suggest that any factual bases predicated the numerous, vague criticisms contained in the April 8, 2003 written warning.

Inconsistencies appear in the other proffered justifications for Mr. Pace's termination. Ms. Segura criticized Mr. Pace for failing to take responsibility for the punishment meted out to Ms. Dzialo. However, when Ms. Dzialo pressed Ms. Segura on the justification for the severity of the discipline, Ms. Segura, like Mr. Pace, invoked consistent application of the rules. Likewise, Ms.

Segura in September, 2003 expressed doubt concerning the most appropriate remediation for Mr. Stein's shortcomings. Only after she terminated Mr. Pace did she indicate certitude on the matter. When viewed in the aggregate, the evidence is sufficient to raise a genuine doubt about USAA's motivation. *Garrett*, 305 F.3d at 1220.

Mr. Pace has provided no statistical analysis of the effect on older employees of USAA's push for higher turnover. However, the anecdotal experiences of colleagues older than 50 is sufficient to create a fact issue of pretext. As the Tenth Circuit has expressly determined, evidence not too remote in time that a defendant terminated others in the same age group as the complainant is relevant to the question of the defendant's policies and practices. *Greene*, 98 F.3d at 561 (*citing Bingman v. Natkin & Co.*, 937 F.2d 553, 556-557 (10th Cir. 1991).

USAA disparages evidence concerning former employees who did not answer to Ms. Segura; because they answered to different supervisors, those employees were not situated similarly to Mr. Pace. This argument meets its answer in *Mendelsohn v. Sprint/United Management Co.*, 466 F.3d 1223 (10th Cir. 2006), in which the Tenth Circuit determined that evidence that an employer terminated other older employees is relevant as evidence of a pattern of dismissal based upon age. The affidavits of Messrs. Pearce, Fisher, and Broekelman are introduced not to show disparate treatment of similarly-situated employees but rather similar, unfavorable treatment of other employees in the protected class. *Greene*, 98 F.3d at 561; *Mendelsohn*, 466 F.3d at 1226-1227.

In its reply, USAA correctly argues that it could permissibly have increased turnover in order to cut costs, even if that reorganization had a disproportionate effect upon older employees. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993).

However, USAA has not proffered cost-cutting as its legitimate non-discriminatory reason for Mr. Pace's termination. Rather, it claims to have lost confidence in Mr. Pace's leadership, about which doubt remains for a jury to resolve. Indeed, USAA expressly disavows any attempt to tie Mr. Pace's dismissal to its increased turnover. In its reply brief it states that "any past reorganization is immaterial to Plaintiff's case, as it is undisputed that Plaintiff was terminated in November 2003 for lack of judgment and for demonstrating poor leadership and poor management, and not as part of a previous reorganization."

The parties do not address Mr. Pace's age discrimination claim under Colo. Rev. Stat. § 24-34-402. However, I note that Colorado courts look to federal interpretations of the ADEA as persuasive authority on the requirements of the Colorado age discrimination statute. *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1198 (Colo. App. 1997). Thus, I have no reason to believe that Mr. Pace's claim, having survived summary judgment under the ADEA, does not similarly persist under the Colorado statute.

Mr. Pace impermissibly took with him upon his departure documents to which USAA asserts he had no legal entitlement. Citing *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995), USAA argues that the documents in Mr. Pace's possession constitute after-acquired evidence of wrongdoing that, in any event, would have led to Mr. Pace's termination on lawful and legitimate grounds. *See also*, *Crawford Rehabilitation Services, Inc. v. Weissman*, 938 P.2d 540 (Colo. 1997). This argument is meritless. USAA could not lawfully or legitimately have terminated Mr. Pace on November 6, 2003 for acts he had not yet committed.

Accordingly, it is ORDERED that:

1) USAA's motion [#50] is GRANTED in part and DENIED in part;

2) Mr. Pace's claims for race discrimination, sex discrimination, and retaliation are DISMISSED.

Dated: December __19__, 2006, in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge